**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 16-cv-02557–RM–KLM

ELENA SUMLER,

     Plaintiff,

v.

UNIVERSITY OF COLORADO HOSPITAL AUTHORITY,

     Defendant.

---

## ORDER

---

Plaintiff claims that the Defendant failed to hire her for a sonographer position at Memorial Health System in Colorado Springs, Colorado because it regarded her as disabled when she was not. The parties' cross-motions for summary judgment ask the Court to determine several issues relating to Plaintiff's alleged violations of the Rehabilitation Act, 29 U.S.C. § 701, *et seq.* and the Americans with Disabilities Act ("ADA"), *as amended by* ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110–325, 122 Stat. 3553, 42 U.S.C. § 12101, *et seq.* Plaintiff seeks partial summary judgment arguing that Defendant violated the ADA by subjecting her to improper medical inquiries after extending a conditional offer of employment. (ECF No. 46.) Defendant moves for summary judgment as to all of Plaintiff's claims. (ECF No. 51.) Defendant first contends that Plaintiff failed to administratively exhaust her medical inquiry claim and that, in any event, its medical questionnaire and examination complied with the ADA—thus, it fails as a matter of law. Defendant then maintains that Plaintiff was not qualified for the position that she sought with the hospital, meaning that her claims under the Rehabilitation Act and ADAAA also fail.

For the reasons discussed below, the Court DENIES Plaintiff's motion for partial summary judgment (ECF No. 46). The Court GRANTS Defendant's motion for summary judgment (ECF No. 51).

## I.     BACKGROUND

The following are the undisputed and material facts taken from the parties' statements of undisputed facts and accompanying exhibits.

### A.     Plaintiff's Application for Employment

Plaintiff is a sonographer.[1]   (ECF No. 62, Pl.'s Sep. Statement of Undisputed Mat. Facts ("Pl.'s SUMF"), Pl.'s SUMF ¶ 1.)   Defendant sought to employ a PRN Sonographer at its Memorial Health System in Colorado Springs, Colorado.   (ECF No. 68, Def.'s Sep. Statement of Undisputed Mat. Facts ("Def.'s SUMF"), Def.'s SUMF ¶ 1.)   On September 24, 2014, Plaintiff applied to be hired for the PRN Sonographer position with Defendant.   (*Id.*)   On October 20, 2014, Defendant extended a conditional offer of employment to Plaintiff for the position.   (ECF No. 62, Pl.'s SUMF ¶ 3.)   Defendant's employment offer was conditioned on successful completion of its pre-employment screening, which required Plaintiff to complete an "Employee Health Questionnaire."   (ECF No. 62, Pl.'s SUMF ¶ 4; ECF No. 68, Def.'s SUMF ¶¶ 4-5.)   All

---

1   The Mayo Clinic describes a sonographer's job as follows:

>   Diagnostic medical sonographers and vascular technologists use nonionizing, high-frequency sound waves (ultrasound) to diagnose, treat and prevent medical conditions.

>   The sonographer or technologist operates sophisticated electronic equipment that collects reflected ultrasound 'echoes' and Doppler signals and uses them to form images of many parts of the body. Ultrasound imaging is used to view organs within the abdomen, fetuses in the womb and spectral tracings in blood vessels (arteries and veins).

>   Sonographers and vascular technologists work closely with patients throughout the ultrasound procedures. Sonographers look for subtle differences between healthy and pathological areas of the body and work collaboratively with physicians to ensure that images are satisfactory for diagnosis.

Mayo Clinic School of Health Sciences, Sonography (October 5, 2018) https://www.mayo.edu/ mayo-clinic-school-of-health-sciences/careers/sonography.

candidates seeking employment must complete the Employee Health Questionnaire, including Plaintiff.   (ECF No. 68, Def.'s SUMF ¶¶ 5-6.)

The Employee Health Questionnaire requested that applicants list current medical conditions and current medications.   (ECF No. 62, Pl.'s SUMF ¶ 5-7.)   As a current medical condition, Plaintiff identified "Fibromyalgia."   (ECF No. 62, Pl.'s SUMF ¶ 8; ECF No. 68, Def.'s SUMF ¶ 7.)   As current medications, Plaintiff listed the following: "Metaxalone, Cymbalta, Oxycodone, [and] Fentanyl."   (ECF No. 62, Pl.'s SUMF ¶ 6; ECF No. 68, Def.'s SUMF ¶ 7.) Oxycodone and Fentanyl are narcotic painkillers; Cymbalta is an antidepressant; and Metaxalone is a muscle relaxer.   (ECF No. 68, Def.'s SUMF ¶ 8-9.)   Defendant's standing policy required that use of narcotics, muscle relaxers, or antidepressants triggered a further examination by an occupational health physician, Dr. Roth.   (ECF No. 68, Def.'s SUMF ¶ 10.)   Dr. Roth has contracted with Defendant to provide pre-employment health screenings of prospective employees.   (ECF No. 58-3, Empl. Contract at 12.)

On October 29, 2014, Dr. Roth met Plaintiff to explain that he would need to review her medical records and discuss her medical conditions with her treating physician, Dr. Brooks, who specializes in pain management.   (ECF No. 49-12 at 3; ECF No. 68, Def.'s SUMF ¶ 17.)   Dr. Roth reviewed Plaintiff's treatment notes and spoke directly to Dr. Brooks.   (ECF No. 68, Def.'s SUMF ¶¶ 16, 22.)   Dr. Roth met with Plaintiff again on November 6, 2014, where he explained that he would be assigning work restrictions based on her medical conditions and medication use. (ECF No. 49-12 at 4; ECF No. 68, Def.'s SUMF ¶ 17.)   Based on his meeting with Plaintiff, review of her medical records, and discussion with Dr. Brooks, Dr. Roth concluded that Plaintiff suffered from widespread pain disorder comprised of two components: (1) a spine-related issue that caused back pain; and (2) fibromyalgia.   (ECF No. 68, Def.'s SUMF ¶ 23.)   It is undisputed

that Plaintiff's pain disorder required narcotic pain medication in order for her to maintain her

activity.  (*Id.*, Def.'s SUMF ¶ 24.)   Based on Plaintiff's medical conditions and medication use,

Dr. Roth recommended the following seven restrictions and limitations on Plaintiff's work

activities:

1. Not able to utilize fentanyl patch within 24 hours of work;
2. Not able to utilize a narcotic medication or tranquilizer within eight hours of a
   work shift;
3. Employee health to periodically monitor the Prescription Drug Monitoring
   Program and treatment records;
4. No prolonged postures sustained greater than 30 minutes;
5. Maximum materials handling 20 pounds;
6. No repetitive reaching above chest, reaching overhead or reaching away from
   her body;
7. No patient transfers or boosting.

(*Id.*, Def.'s SUMF ¶ 25.)   Defendant's ADA Coordinator, Chris Esser, reviewed Dr. Roth's

restrictions and the sonographer job description.  (*Id.*, Def.'s SUMF ¶ 29.)

The parties agree that the sonographer job description requires the following from

Plaintiff: mental acuity and great uninterrupted concentration; acquisition and analysis of data

using ultrasound; optimization of computer images to enhance diagnostic information for

physician interpretation; determining normal from pathological variants through sonographic

recognition of characteristics for normal and abnormal tissue, structure, blood flow, proper patient

positioning and transducer-instrument selection.  (*Id.*, Def.'s SUMF ¶¶ 31, 48.)   Sonographers

maintain responsibility for all exams and provide a preliminary summary of findings to the

physician.  (*Id.*, Def.'s SUMF ¶ 47.)   Defendant requires sonographers to have the ability to lift

up to fifty pounds as they are responsible for assisting patients who have fallen or are falling—and

Defendant's patients may be pediatric, elderly, obese, or immobilized.  (*Id.*, Def.'s SUMF ¶¶ 35,

36, 40.)   Based on the limitations imposed by Dr. Roth when compared to the job description, on

November 11, 2014, Defendant rescinded its conditional offer of employment to Plaintiff after concluding that she was not qualified for the position. (*Id.*, Def.'s SUMF ¶¶ 50-51.)

Plaintiff counters that she was qualified for the position, which is the heart of the parties' dispute. Plaintiff ardently disagrees with Dr. Roth's restrictions: "To describe all the reasons that Dr. Roth's opinion is not entitled to credence would fill pages." (*Id.*, Pl.'s Resp. to Def.'s SUMF ¶ 25.) According to Plaintiff, Dr. Roth's opinion should not be considered because he is paid a salary of $156,000 per year by Defendant to perform these exams, making him a biased and interested witness. (*Id.* (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 149-51 (2000).) Regarding the physical limitations, Plaintiff argues that Dr. Roth did not order or perform a functional capacity exam which would have provided objective medical evidence of Plaintiff's ability to lift. (*Id.*, Pl.'s Resp. to Def.'s SUMF ¶ 26.) Plaintiff also points out that her own doctor, Dr. Brooks, had not issued any work restrictions. (*Id.*)

Finally, Dr. Roth opined that Plaintiff could not use her pain medications within the specified periods of time described above because the sonographer position is "safety-sensitive." Plaintiff contests whether Dr. Roth actually considered the sonographer position to be "safety-sensitive." (*Id.*, Pl.'s Resp. to Def.'s SUMF ¶ 27.) Dr. Roth supports his conclusion to issue the above-described restrictions regarding Plaintiff's medication use with a guideline from the American College of Occupational and Environmental Medicine titled, *ACOEM Practice Guidelines: Opioids and Safety-Sensitive Work*. (*Id.*, Def.'s SUMF ¶ 26.) The ACOEM guideline states: "Other evidence suggests cognitive compromise among those with chronic opioid use, especially decision-making." (*Id.*, Def.'s SUMF ¶ 26; *see also* ECF No. 49-18 at 1.) Plaintiff's rejoinder is to attach a declaration and video to establish that she could lift fifty pounds of horse chow and dog chow at the time she was being evaluated by Dr. Roth. (*Id.*, Pl.'s Resp. to

Def.'s SUMF ¶ 27.)   Additionally, Plaintiff's declaration attests that she performed the same types of physical labor, without incident, in her previous sonographer job with ASAP Labs.   (*Id.*; *see also* ECF No. 58-17, Decl. of Elena Sumler.)

### B.   Administrative Charge

On December 27, 2014, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission.   (ECF No. 68, Def.'s SUMF, AF ¶ 15; ECF No. 49-21.) Plaintiff's charge asserted disability discrimination.   (ECF No. 49-21 at 2.)   Specifically, Plaintiff's charge stated: "I have a disability as defined within the meaning of the ADA of which [Defendant] was aware due to its medical questionnaire."   (*Id.*)   And "[o]n or about October 30, 2014, [Plaintiff] was told that [she] could not perform the job because of [her] disability and [her] prescribed medications by Dr. Henry Roth, the physician who interviewed [her] on behalf of [Defendant.]"   (*Id.*)   Plaintiff received a right to sue letter from the EEOC on September 29, 2016.   (ECF No. 40 at ¶ 6.)   Plaintiff initiated this lawsuit on October 13, 2016.   (ECF No. 1, Compl.)

### C.   This Lawsuit

Plaintiff's initial complaint and amended complaint alleged three claims for relief: (1) violation of the Rehabilitation Act by rescinding Defendant's offer of employment based on actual and "regarded as" disability and failing to accommodate Plaintiff's disability; (2) violation of the ADA based on Defendant's medical questionnaire; and (3) violation of the ADAA based on rescission of the job offer because of Plaintiff's actual and "regarded as" disability and failing to reasonably accommodate Plaintiff.   (ECF No. 4 at ¶¶ 51-56, 59-61, 64-69.)   On October 5, 2017, the parties stipulated to dismissal of two claims in Plaintiff's first amended complaint, including "(a) the claims under both the ADA and the [Rehabilitation Act] that Defendant rescinded its job

offer based on Plaintiff's having an actual disability and (b) any claim that Defendant failed to provide reasonable accommodations." (ECF No. 38 at 2, ¶ 3.) As a result, two claims survived the stipulation: "[that] (a) Defendant rescinded its offer of employment to Plaintiff because Defendant regard[ed] Plaintiff as having a disability and (b) [D]efendant's violation of the medical inquiry provisions of the ADA." (*Id.* at 2, ¶ 4.) On October 11, 2017, the Court approved the stipulation and dismissed with prejudice "Plaintiff's claims that Defendant rescinded its offer of employment to Plaintiff because she has an actual disability and that Defendant failed to reasonably accommodate Plaintiff's disability[.]" (ECF No. 39.) The Court also ordered Plaintiff to file an amended complaint to include only the remaining claims, which Plaintiff did on October 16, 2017, making the second amended complaint operative in this matter. (ECF No. 40, Sec. Am. Compl.)

Plaintiff seeks partial summary judgment on her second claim for relief—violation of the ADA alleging she was subjected to a medical examination not required of all applicants. (ECF No. 46 at 2.) Defendant seeks summary judgment in its favor as to all Plaintiff's claims. (ECF No. 51.) Regarding the claim for violation of the ADA based on Plaintiff's medical examination, Defendant asserts that (a) Plaintiff failed to administratively exhaust the claim, and notwithstanding the exhaustion issue, (b) it complied with the applicable statute and regulation addressing such examinations. (*Id.* at 4-5.) With respect to Plaintiff's claim that she was not hired because Defendant regarded her as disabled, Defendant argues that Plaintiff was not qualified for the position and, even if she was qualified, her use of narcotics would have posed a direct threat to the health or safety of herself and others. (ECF No. 51 at 6-18.) Each party opposes the other's request for summary judgment. (ECF Nos. 52 and 57.)

## II.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.    Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569–70 (10th Cir. 1994).    Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one-sided that one party must prevail as a matter of law.    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987).    Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden then shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact to be resolved at trial.    *See 1-800-Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013) (citation omitted).

The Court will consider statements of fact, or rebuttals thereto, which are material and supported by competent evidence.    Fed. R. Civ. P. 56(c)(1)(A), 56(e)(2), 56(e)(3).    Summary judgment evidence need not be submitted in a form that would be admissible at trial, but the content or substance of the evidence must be admissible.    *Johnson v. Weld Cty.*, 594 F.3d 1202, 1210 (10th Cir. 2010).    Affidavits must be based on personal knowledge and must set forth facts that would be admissible at trial.    *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (quotations and citation omitted).    "Conclusory and self-serving affidavits are not sufficient." *Id*.    "[O]n a motion for summary judgment, it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record."    *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004)

(quotations and citation omitted). The Court is "not obligated to comb the record in order to make [a party's arguments]." *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1199 (10th Cir. 2000).

"Where, as here, we are presented with cross-motions for summary judgment, we must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 906–07 (10th Cir. 2016) (citations and quotations omitted). "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" *Id.* (*quoting Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979)). The Court now addresses each claim and motion in turn.

## III. ANALYSIS

### A. ADA Medical Inquiry Claim

Plaintiff moves for partial summary judgment claiming that "Defendant clearly violated the [ADA] because not every person who fills out the health questionnaire is examined by Dr. Roth, regardless of their disability." (ECF No. 46 at 3.) Defendant opposes Plaintiff's motion and affirmatively moves for summary judgment in its favor asserting two arguments: (1) Plaintiff failed to administratively exhaust this claim; and (2) the claim fails on the merits because Defendant's medical inquiries comply with the applicable statute and EEOC regulations. (ECF No. 51 at 4-5.)

#### 1. Administrative exhaustion

"In the Tenth Circuit, exhaustion of administrative remedies is a jurisdictional prerequisite to suit." *Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007) (citations omitted). And "[a] plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *Id.* The Court is to "liberally construe charges filed with the EEOC in determining whether

9

administrative remedies have been exhausted as to a particular claim." *Id.*

Here, Plaintiff's administrative charge claimed discrimination on the basis of a disability, stated that Defendant was aware of that disability due to its medical questionnaire, and then was told that she could not perform the job because of her "disability and . . . prescribed medications by Dr. Henry Roth, the physician who interviewed [her] on behalf of [Defendant.]"  (ECF No. 49-21 at 2.)  Plaintiff's charge specifically identified discrimination based on disability, specifically identified the medical questionnaire, and then went on to identify Dr. Roth, the physician who conducted Plaintiff's medical examination.  (*Id.*)  Dr. Roth is also identified as the person who told Plaintiff she could not perform the job that is at issue in this lawsuit based on his "interview" with her.  (*Id.*)  Although Plaintiff did not specifically list the claimed legal defects with the medical questionnaire or properly label Dr. Roth's interview as a medical examination, the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination includes Plaintiff's second claim for relief based on the alleged improper medical inquiry.   Therefore, Plaintiff exhausted her administrative remedies and the Court has jurisdiction over the claim.

### 2.   *Merits of the medical inquiry claim*

The ADA specifically addresses the medical examinations and inquiries that may be made by a prospective employer.   42 U.S.C. § 12112(d).   The statute distinguishes between a preemployment examination and a post-offer examination.   *Compare* 42 U.S.C. § 12112(d)(2) *with* § 12112(d)(3).   *Before* an employment offer has been made, "a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability."   42 U.S.C. § 12112(d)(2)(A).   Preemployment inquiries may only be made "into the ability of an application to

10

perform job-related functions."  42 U.S.C. § 12112(d)(2)(B).   But *after* an offer of employment

has been made to a job applicant, a covered employer may require the job applicant to undergo a

medical examination.   42 U.S.C. § 12112(d)(3).   Section 12112(d)(3) states as follows:

> A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if--
>
> (A)      all entering employees are subjected to such an examination regardless of disability;
>
> (B)      information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that--
>
> (i) supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;
>
> (ii) first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and
>
> (iii) government officials investigating compliance with this chapter shall be provided relevant information on request; and
>
> (C) the results of such examination are used only in accordance with this subchapter.

42 U.S.C. § 12112(d)(3).   EEOC regulation 29 C.F.R. § 1630.14(b)(3), which implements section

12112(d)(3), further elaborates on medical entrance examinations as follows:

> (b) Employment entrance examination. A covered entity may require a medical examination (and/or inquiry) after making an offer of employment to a job applicant and before the applicant begins his or her employment duties, and may condition an offer of employment on the results of such examination (and/or inquiry), if all entering employees in the same job category are subjected to such an examination (and/or inquiry) regardless of disability.
>
> *                    *                    *                    *
>
> (3) Medical examinations conducted in accordance with this section do not have to be job-related and consistent with business necessity. However, if certain criteria are used to screen out an employee or employees with disabilities as a result of such an

examination or inquiry, the exclusionary criteria must be job-related and consistent with business necessity, and performance of the essential job functions cannot be accomplished with reasonable accommodation as required in this part. (See § 1630.15(b) Defenses to charges of discriminatory application of selection criteria.)

29 C.F.R. § 1630.14(b)(3).

First, the parties disagree as to the applicable legal standard. Plaintiff rejects the authority of the EEOC regulation arguing "that the EEOC does not have the authority to broaden the scope of the statute as passed by Congress simply by administrative fiat." (ECF No. 46 at 3.) Plaintiff cites no legal authority to support this cursory argument. (*Id.*) Defendant responds that the EEOC regulation is entitled to deference because the "regulation makes sense of the statutory language" by clarifying that permission to conduct a post-offer medical *examination* includes permission to conduct a less intrusive post-offer medical *inquiry*. (ECF No. 52 at 3 (citing *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 84 (2002) and *Federal Express Corp. v. Holowecki*, 552 U.S. 389, 399 (2008).) The Court finds the EEOC's regulation at 29 C.F.R. § 1630.14(b)(3) to be consistent with and a reasonable interpretation of 42 U.S.C. § 12112(d)(3). Accordingly, the regulation should be entitled to deference. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations."). This brings us to the ultimate question posed by this claim, which is whether the Defendant's medical inquiries of Plaintiff comply with the ADA and implementing regulations. The Court concludes that they do.

To start with, Plaintiff's operative complaint does not allege any claim based on the medical examination. (*See generally* ECF No. 40.) Instead, the complaint specifically alleges that "[t]he questions presented to plaintiff in the *pre-employment medical questionnaire* violated the medical inquiries provisions of the ADA." (ECF No. 40 at ¶ 56 (emphasis added).) Although Plaintiff's

complaint contains facts regarding the subsequent medical examination, those allegations concern the adequacy of Dr. Roth's examination. (*Id.* at ¶¶ 17, 26, 39, 41, and 42.) The Court could decline to address Plaintiff's arguments relating to her medical examination as there are no facts alleged in the operative complaint to support such a claim. Nonetheless, Plaintiff's medical inquiries "claim" based on the medical examination ultimately fails.

Plaintiff advances two arguments to support its medical inquiries claim: (1) Defendant violated the law because all applicants for sonographer positions were not examined by Dr. Roth; and (2) the criteria Defendant used were not job related or consistent with business necessity as required by 42 U.S.C. § 12112(d)(3) and 29 C.F.R. § 1630.14(b)(3). (ECF No. 57 at 4-9.) Defendant responds by pointing to the EEOC's guidance on the issue that specifically permits an employer to refer candidates for further medical examinations based on initial questions. (ECF No. 67 at 3-4.) And additionally, Defendant maintains that the criteria used were job related and consistent with a business necessity. (*Id.* at 4-6.) The Court agrees with Defendant.

Here, all employment candidates, including Plaintiff, complete the same health questionnaire form, regardless of disability. (ECF No. 68, Def.'s SUMF ¶ 6.) Based on Plaintiff's responses on the health questionnaire, Defendant compared her answers to its "algorithm," which is a decision tree as to when an applicant should be subjected to a further medical evaluation. (*Id.*, Def.'s SUMF AF ¶¶ 7-8.) Defendant's algorithm requires a further health screening (or medical examination) if an applicant identifies using medications that are narcotics, antidepressants, tranquilizers, or muscle relaxers. (ECF No. 49-17, Def.'s Algorithm at 1-2.) Plaintiff was using three out of the four "trigger" medications—as a result, Defendant arranged for a further evaluation by Dr. Roth. The Court finds nothing wrong with such a uniformly applied process. Indeed, Plaintiff implicitly suggests that Defendant could have

13

conducted a full medical examination of her (and all other candidates) had it not first asked her to complete the health questionnaire. Such an illogical position cannot stand. The Court finds that Defendant properly conditioned its offer of employment on the results of such examination (and/or inquiry) because all entering employees in the same job category were subjected to such an examination (and/or inquiry) regardless of disability.[2]

Moreover, the triggering criteria—use of narcotics, antidepressants, tranquilizers, or muscle relaxers—are job-related and consistent with business necessity. It is undisputed that sonography requires a great amount of mental acuity and uninterrupted concentration. (ECF No. 68, Def.'s SUMF ¶ 30.) Defendant presents evidence that chronic opioid use compromises decision-making. (*Id.*, Def.'s SUMF ¶¶ 27-28.) In response, Plaintiff disagrees that her medications affect her ability to perform the job of a sonographer by *arguing* that she had previously worked at ASAP Labs with no problems. (*Id.*, Resp. to Def.'s SUMF ¶¶ 27-28.) But Plaintiff presents no *evidence* to support such a disagreement—and on summary judgment, *evidence* matters. Simply put, Plaintiff presents no evidence that mental acuity and concentration are not job-related or consistent with business necessity. For these reasons, the Court finds that Plaintiff fails to establish a dispute as to any material fact and Defendant is entitled to judgment as a matter of law.

---

[2]   Although the Court finds that Defendant complied with the applicable statute and regulations concerning post-offer medical inquiries and examinations, the EEOC Guidelines offer further support for the Court's conclusion:

> After an employer has obtained basic medical information from all individuals who have been given conditional offers in a job category, may it ask specific individuals for more medical information?

> Yes, if the follow-up examinations or questions are medically related to the previously obtained medical information.

> Example:   At the post-offer stage, an employer asks new hires whether they have had back injuries, and learns that some of the individuals have had such injuries.   The employer may give medical examinations designed to diagnose back impairments to persons who stated that they had prior back injuries, as long as these examinations are medically related to those injuries.

EEOC Notice 915.002, Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations (October 10, 1995), https://www.eeoc.gov/policy/docs/preemp.html (last modified July 6, 2000).

**B.      Rehabilitation Act and ADAA Claim**

The Rehabilitation Act borrows its substantive standards from the ADA—thus, Plaintiff's first and third claims for relief will be addressed together as the law is the same.   *See* 29 U.S.C. § 791(f).   These claims assert that Defendant erroneously regarded Plaintiff as having an impairment which was more significant than her actual impairment, she was qualified to perform the essential functions of the sonographer job, and she is therefore protected under the "regarded as" prong of the Rehabilitation Act and ADAAA.   (ECF No. 40, Sec. Am. Compl. at ¶¶ 50-51, 61-62.)   Defendant moves for summary judgment contending that Plaintiff was not qualified for the position and posed a direct threat to herself and others.   (ECF No. 51 at 6-16.)   Plaintiff responds that she was able to perform the essential functions of the job as a sonographer and did not pose a direct threat to herself or others.   (ECF No. 57 at 11-20.)

### 1.   *Applicability of the* **McDonnell Douglas** *framework*

Plaintiff argues that direct evidence of discrimination exists because Defendant withdrew the offer of employment based on Plaintiff's medical condition, the medications she was taking, and the restrictions placed on her by Dr. Roth.   (ECF No. 57 at 14.)   As a result, Plaintiff contends that the *McDonnell Douglas* burden-shifting framework does not apply.   (*Id.*)   The Court rejects Plaintiff's argument because she presents no direct evidence of discrimination based on a disability.

"Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption."   *Hall v. U.S. Dep't of Labor, Admin. Review Bd.*, 476 F.3d 847, 854 (10th Cir. 2007) (citations and quotations omitted); *see also Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224–25 (10th Cir. 2008) (explaining that a letter stating the reasons for termination did not constitute "direct evidence of retaliation, as it [was] not retaliatory on its face

and would require us to infer retaliatory motive[.]").  "Statements of personal opinion, even when reflecting personal bias or prejudice, do not constitute direct evidence of discrimination, but at most, are only circumstantial evidence of discrimination because the trier of fact must infer discriminatory intent from such statements."  *Id.* at 855.  "[S]trictly speaking, the only 'direct evidence' that a decision was made 'because of' an impermissible factor would be an admission by the decisionmaker such as 'I fired him because he was too old.'  Even a highly-probative statement like 'You're fired, old man' still requires the factfinder to draw the inference that the plaintiff's age had a causal relationship to the decision."  *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1000 n.8 (10th Cir. 2011).  Here, Dr. Roth imposed physical restrictions and restrictions on Plaintiff's medication use.  Because of those restrictions, human resources concluded that Plaintiff was not qualified for the position.  Plaintiff presents no direct evidence that Defendant withdrew the employment offer because of discrimination.

Where there is no direct evidence of discrimination, the familiar *McDonnell Douglas* burden-shifting framework applies to Plaintiff's disability discrimination claims.  *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017).  Under *McDonnell Douglas*, Plaintiff must first establish a *prima facie* case of disability discrimination.  *Id.*  If Plaintiff makes out a *prima facie* case, the burden shifts to Defendant to come forward with a legitimate, nondiscriminatory basis for its employment decision.  *Id.*  If Defendant does so, the inference of discrimination disappears and the burden shifts back to Plaintiff and he must offer evidence that Defendant's nondiscriminatory reason was merely pretext.  *Id.*  The Court will address each portion of the *McDonnell Douglas* test.

### 2.  Prima Facie *Burden*

A *prima facie* case for discrimination under the ADAAA, requires Plaintiff to establish

three things: (1) she is disabled within the meaning of the ADAAA; (2) she is qualified to perform the essential functions of the job desired;[3] and (3) she suffered discrimination by a prospective employer because of that disability. *Dewitt*, 845 F.3d at 1308. The parties focus their dispute on the second element as to whether Plaintiff was qualified to perform the essential functions of the sonographer position.

"The plaintiff bears the burden of showing she is able to perform the essential functions of her job." *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004) (citing *US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002)). There are two essential functions at issue—one, that a sonographer be required to lift fifty pounds and, two, that a sonographer must possess mental acuity and great uninterrupted concentration. First, to determine whether these are essential job functions, the Court looks at whether Defendant actually requires all employees in the particular position to satisfy the alleged job-related requirement. *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1262 (10th Cir. 2009). Next, if Defendant satisfies the first inquiry, the Court looks to a number of factors to determine whether the requirements are fundamental to the sonographer position. *Id.* Those factors are as follows:

(i)     The employer's judgment as to which functions are essential;
(ii)    Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii)   The amount of time spent on the job performing the function;
(iv)    The consequences of not requiring the incumbent to perform the function;
(v)     The terms of a collective bargaining agreement;
(vi)    The work experience of past incumbents in the job; and/or
(vii)   The current work experience of incumbents in similar jobs.

*Id.* (citing 29 C.F.R. § 1630.2(n)(3) and *Mason*, 357 F.3d at 1119).

In the Tenth Circuit, several additional principles guide the Court's analysis. Generally,

---

3  Whether Plaintiff could perform the essential functions of the job desired with reasonable accommodations is not an issue where a plaintiff is "regarded as" disabled as opposed to discrimination based on an actual disability. 42 U.S.C. § 12201(h).

"the employer describes the job and functions required to perform that job, and we defer to the employer's description." *Adair v. City of Muskogee*, 823 F.3d 1297, 1307-08 (10th Cir. 2016) (quotations and citations omitted). The Circuit has further explained that "the essential function inquiry is not intended to second guess the employer or to require the employer to lower company standards." *Id.* A court should "not second guess the employer's judgment when its description is job-related, uniformly enforced, and consistent with business necessity." *Id.* at 1308. "In disability-discrimination cases, it is not our job as a court to sit as a super personnel department that second guesses employers' business judgments." *Id.* "But the employer's judgment is not conclusive evidence." *Id.* Accordingly, "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description." *Id.* Courts still "weigh *heavily* the employer's judgment regarding whether a job function is essential." *Id.* (emphasis in original).

In this case, Plaintiff dedicates substantial effort to establishing that she can lift fifty pounds. Although the Court finds that having the ability to lift an injured patient is undoubtedly important and related to the job of a sonographer, neither party disputes the mental requirements of the sonographer position: mental acuity and great uninterrupted concentration; acquisition and analysis of data using ultrasound; optimization of computer images to enhance diagnostic information for physician interpretation; determining normal from pathological variants through sonographic recognition of characteristics for normal and abnormal tissue, structure, blood flow, proper patient positioning and transducer-instrument selection. (ECF No. 68, Def.'s SUMF ¶¶ 31, 48.) Based on the evidence presented to the Court, Defendant requires such mental acumen of all sonographers. Indeed, the use of mental acumen to obtain ultrasound images for a physician's diagnosis, treatment, and prevention of medical conditions *is* the job of a sonographer—in other

words, it is an essential job function.

Moreover, the regulatory factors weigh in favor of concluding that mental acuity is an essential function of the sonographer job: in Defendant's judgment, mental acuity, analysis, and great concentration are essential functions included in the job description; although the amount of time is not specified, it appears to the Court that obtaining and analyzing ultrasound images is the main function for a sonographer; and the consequences of a misdiagnosis could be severe. Therefore, based on the factors outlined in 29 C.F.R. § 1630.2(n)(3), the Court concludes that mental acuity and concentration are essential functions of the sonographer position.

And Defendant presents evidence, in the form of objective medical literature, that Plaintiff's medications cause compromised cognitive function and decision-making. (ECF No. 68, Def.'s SUMF ¶ 14.) Plaintiff's own doctor, Dr. Brooks, warned that her prescriptions may cause drowsiness, unclear thinking, and cautioned against caring for herself or others as reflexes and reaction time might be slowed without Plaintiff being aware of it. (*Id.*, Def.'s SUMF ¶ 21.) Plaintiff's response underscores the failure of her claim.

First, Plaintiff argues that Dr. Roth's opinions are not binding evidence that Plaintiff was unable to perform the essential functions of the job. (ECF No. 57 at 11.) But it is *Plaintiff's burden* to come forward with evidence that she was able to perform the essential functions of the sonographer job. *Mason*, 357 F.3d at 1119. Defendant has both pointed to a lack of evidence on this element and affirmatively submitted evidence from Dr. Roth and Dr. Brooks that Plaintiff's medications cause compromised cognitive function. And on summary judgment, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also Jarvis v. Nobel/Sysco Food Servs. Co.*, 985 F.2d 1419, 1423 (10th Cir. 1993) (citing

*Celotex* for the proposition that "[t]he moving party [need not] support its motion with affidavits or other similar materials *negating* the opponent's claim.").   Either way, Defendant has satisfied its burden on summary judgment by presenting affirmative evidence from Drs. Roth and Brooks regarding Plaintiff's compromised cognitive function and by pointing to Plaintiff's lack of evidence.

In addition to disagreeing with Dr. Roth's opinions, Plaintiff relies on *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) for the proposition that "even the *uncontradicted* testimony of interested witnesses supporting the employer, such as supervisors and other workers, should not be considered or otherwise weighed in the summary judgment balancing[.]"   (ECF No. 57 at 11-12 (emphasis in original).)   Plaintiff's reliance is misplaced.   *Reeves* explained that "the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."   *Id.* at 151.   However, the *Reeves* court also noted that "an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."   *Id.* at 148.

*Reeves* does not help Plaintiff here because the record contains no evidence that Plaintiff could perform the essential mental functions of the job.   Plaintiff attacks the credibility of Dr. Roth's opinions, but fails to address the evidence from Dr. Brooks (her own doctor) who also warned that her prescriptions may cause drowsiness, unclear thinking, and cautioned against caring for herself or others as reflexes and reaction time might be slowed without Plaintiff being aware of

it. Thus, even apart from the opinion of Dr. Roth, there is evidence that Plaintiff's medications affected her cognitive function. Moreover, Plaintiff's own declaration submitted in opposition to the motion, fails to address the cognitive requirements of the sonographer position. (ECF No. 58-17, Pl.'s Decl.) Instead, Plaintiff states that her "job as a sonographer for ASAP Labs involved the same type of physical labor described in Memorial's job description" and that she "performed [her] job with ASAP without suffering any physical injuries." (*Id.* at ¶¶ 7-8.) Again, Plaintiff addresses the physical lifting component without controverting the cognitive limitations caused by her medications. As such, Plaintiff has failed to establish a genuine dispute as to any material fact related to cognitive function. Defendant is entitled to judgment as a matter of law because Plaintiff has failed to present any evidence that she was able to perform this essential function of her job, meaning that she was not qualified for the position.

### 3. *Legitimate, Nondiscriminatory Reasons for Adverse Employment Action*

Assuming Plaintiff could establish her *prima facie* case and shift the burden to Defendant, Defendant has come forward with legitimate, nondiscriminatory reasons for withdrawal of Plaintiff's employment offer. Defendant presents evidence that Plaintiff was not hired because she could not meet the physical (lift fifty pounds) or mental requirements (mental acuity and concentration) of the position. (ECF No. 68, Def.'s SUMF ¶¶ 23- 25.) The Court finds that these explanations are legitimate, nondiscriminatory bases for not hiring Plaintiff.

### 4. *Pretext*

Accordingly, the burden would, if Plaintiff were qualified, shift back to her to show that the proffered bases are a pretext for discrimination. In order to establish a genuine issue of material fact as to pretext, a plaintiff must produce evidence that would allow a reasonable juror to find that the defendant's nondiscriminatory reason is "unworthy of belief." *Randle v. City of Aurora*, 69

F.3d 441, 451 (10th Cir. 1995); *see also Dewitt*, 845 F.3d at 1308. A plaintiff can meet this burden with "evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006) (internal quotation and citation omitted); *see also Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014). "The plaintiff must show by a preponderance of the evidence that the legitimate reasons offered by the defendant were a pretext *for discrimination*." *Cole v. Ruidoso Mun. Schs.*, 43 F.3d 1373, 1379 (10th Cir. 1994) (citation omitted and emphasis in original). In determining whether a plaintiff has shown pretext, the Court must consider the plaintiff's evidence in its totality. *Orr v. City of Albuquerque*, 531 F.3d 1210, 1215 (10th Cir. 2008). As discussed above, Plaintiff mistakenly concluded that the *McDonnell Douglas* burden-shifting framework does not apply to this claim and failed to directly address pretext. Notwithstanding, a scouring of Plaintiff's response brief and evidence does not establish pretext.

Most of Plaintiff's arguments contest the validity of Dr. Roth's medical opinion and restrictions. (*See* ECF No. 57 at 17-20 (arguing that Dr. Roth is not certified in occupational medicine; failed to perform a functional capacity exam; did not provide human resources with the basis for his opinion; is biased in Defendant's favor because he is compensated).) But "[r]easonable reliance on a medical opinion may demonstrate that an employer did not act on the myths, fears, and stereotypes associated with disability that the 'regarded as' definition of disability was designed to redress." *Jones*, 502 F.3d at 1190. Plaintiff's arguments misunderstand the Court's inquiry here. The Court is not deciding whether Dr. Roth's restrictions were medically right or wrong. Instead, the Court is to decide whether Chris Esser, the ADA

Coordinator from Defendant's human resources department, honestly believed in his reason for rescinding Plaintiff's employment offer and acted in good faith on that belief. *Dewitt*, 845 F.3d at 1310. Plaintiff submits no evidence to even suggest that Mr. Esser rescinded the employment offer for any reason other than his honest belief that Plaintiff was physically and mentally unqualified for the position. Stated differently, there is no evidence that Plaintiff's employment offer was withdrawn based on myths, fears, or stereotypes associated with Plaintiff's "regarded as" disability.

Plaintiff's remaining arguments must be rejected as well. Plaintiff claims that there is no basis to treat applicants different from current employees—suggesting that Defendant does not test current employees for the medications used by Plaintiff, which the Court accepts as true. (ECF No. 57 at 18.) But the ADAAA itself treats pre-offer job applicants, post-offer job applicants, and current employees differently. Thus, federal law, and this Court, rejects the very premise of Plaintiff's argument. *Compare* 42 U.S.C. § 12112(d)(2) *with* § 12112(d)(3).

Finally, Plaintiff takes issue with the requirement that a sonographer be required to lift fifty pounds as a job requirement. (ECF No. 57 at 18-19 (arguing that nobody knows how the fifty pound requirement was arrived at; Defendant employs sonographers as old as sixty-six; sonography does not involve the risk of death; and sonographers are not required to lift patients off the table).) The Court cannot resist pointing out the irony in Plaintiff's suggestion that sonographers who are sixty-six years old may not be strong enough to lift fifty pounds. (*Id.* at 19.) Such a discriminatory, age-related stereotype cannot be used to support Plaintiff's disability-related claim of discrimination. Nonetheless, even though Plaintiff questions the propriety of such a lifting requirement, it is not the Court's role to determine whether such a requirement is wise, fair, or correct. *Johnson*, 594 F.3d at 1211. And, as discussed above, such a lifting requirement

pre-dates Plaintiff's application for employment, is rationally job-related, and consistent with business necessity.

In sum, because Plaintiff fails to raise any factual dispute as to whether Defendant's proffered bases for not hiring her were pretext for discrimination, her discrimination claims cannot survive summary judgment.[4] *Proctor v. United Parcel Service*, 502 F.3d 1200, 1211 (10th Cir. 2007) (affirming grant of summary judgment where plaintiff failed to show factual dispute as to pretext). Accordingly, Defendant's motion for summary judgment is granted as to Plaintiff's discrimination claims.[5]

## IV.    CONCLUSION

Based on the foregoing, the Court:

(1)      **DENIES** Plaintiff's motion for partial summary judgment (ECF No. 46);

(2)      **GRANTS** Defendant's motion for summary judgment as to all of Plaintiff's claims (ECF No. 51); and

(3)      **ORDERS** the Clerk to enter JUDGMENT in favor of DEFENDANT and close this case.

DATED this 17th day of October, 2018.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

---

4 In light of the foregoing, the Court does not address Defendant's "direct threat" defense.

5   Plaintiff makes a passing request for oral argument.   (ECF No. 57 at 20.)   Finding the issues appropriate for decision on the briefs, the Court denies Plaintiff's request for oral argument.   D.C.COLO.LCivR 7.1(h) ("A motion may be decided without oral argument, at the court's discretion.").